UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO. 26- 31515 |
| PLEASE & THANK YOU, LLC, | ) | |
| | ) | CHAPTER 11 |
| DEBTOR. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF BROOKE VAUGHN**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY RELIEF**
\*\*\*     \*\*\*     \*\*\*

I, Brooke Vaughn, declare the following under penalty of perjury:

1.      I am the sole member and president of Please & Thank You, LLC ("P&TY" or the "Debtor"), a coffee shop and cookie brand I founded and established in 2010 in Louisville, Kentucky.

2.      I submit this declaration (the "Declaration") in support of the Debtor's chapter 11 petition and First Day Motions (as defined below). This Declaration is intended to assist the Court and other parties in gaining an understanding of the Debtor, its capital structure, the circumstances that led to the commencement of this chapter 11 case (the "Chapter 11 Case"), the Debtor's plans to emerge from chapter 11, and in support of the Debtor's petitions and motions requesting various types of "first day" relief (collectively, the "First Day Motions").

3.      Due to my position with P&TY, I am familiar with the day-to-day operations, business, and financial affairs of the Debtor. Unless otherwise indicated, all statements made in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management or the Debtor's professionals, my review of the relevant documents, or my opinion based upon my experience with and knowledge

of the Debtor's operations and financials. The Debtor authorizes me to submit this Declaration. If called as a witness, I would be able to competently testify to the matters set forth in this Declaration.

4.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Kentucky (the "Court"), thereby commencing the Chapter 11 Case. During the pendency of the Chapter 11 Case, the Debtor intends to operate its business and manage its property as debtor in possession.

5.      The Debtor enters bankruptcy with the goal of restructuring its secured debt and streamlining operations to maximize efficiency and cash flow.

## I.      History of the Debtor

6.      Since its founding in 2010,  P&TY  has grown from a single 850 square foot brick and mortar location to four brick and mortar cafes, two mobile units, two kiosks inside Gainbridge Fieldhouse, and a growing CPG business with our frozen chocolate chip cookie dough.

7.      In 2011, our flagship cafe opened in downtown Louisville at 800 East Market Street. This cafe is still open.

8.      The P&TY commissary bakery opened in the Portland neighborhood in Louisville in 2015, located at 231 North 17th Street, Louisville, KY 40203. This bakery supplies all cafes and wholesale orders. This bakery is still operating.

9.      P&TY's second cafe opened on Frankfort Ave in Louisville in 2016. This cafe is still open.

10. P&TY's third cafe opened in downtown Louisville on Floyd Street in 2017 and was permanently closed during the COVID pandemic. P&TY's landlord refused to provide a pandemic rent abatement and charged P&TY a landlord termination fee of over $27,000.

11. P&TY's fourth cafe was opened in 2019 at 9561 US Highway 42, Suite B, Prospect, KY 40059. This cafe is still open.

12. P&TY's fifth cafe opened in downtown Indianapolis, Indiana in 2023. The address is 849 Massachusetts Avenue, Indianapolis, IN 46204. This location took much longer to open than expected due to supply shortages from the COVID pandemic and cost double our construction estimate. This cafe is still open.

13. In 2024 P&TY partnered with Gainbridge Fieldhouse and Levy Group to open a kiosk inside the Gainbridge Fieldhouse arena. This stadium is home to the Indiana Pacers and the Indiana Fever. With the success of its initial kiosk, in 2025, P&TY added another kiosk inside the stadium. Both kiosks are still operating inside Gainbridge Fieldhouse.

14. A lease on P&TY's sixth cafe was signed in February 2026 in 2908 East 6th Avenue, Denver, CO 80206. Capital improvements were made to the space, equipment was purchased, and the café was furnished. It is currently ready to open, pending City of Denver approval. It was slated to open in June 2026, but the project is stalled due to lack of working capital. This cafe is not yet open.

### A. Events Leading to the Bankruptcy Filing

15. Since 2017, P&TY's goal was to expand as a brand and open new locations. Despite year over year increases in revenue, P&TY has not been profitable since 2019. The

cost of scaling P&TY's brand post-pandemic has been exorbitant. In addition to the pandemic itself, P&TY has struggled financially due to massive increases in the costs of supplies, unpredictable tariffs, and increases in the cost of labor. These issues were exacerbated by receiving untimely financial reports and a negative online smear campaign.

16.     Moreover, P&TY's team has been operationally salary heavy since the pandemic. With guidance from a Department of Labor audit conducted in 2022, P&TY restructured its operations team to better service the staff and needs of a scaling company. This mandated reorganization added a financial burden to P&TY's operational expenses; however, I was optimistic that P&TY could overcome the financial deficit through scaling and growth.

17.     In 2024 and 2025, P&TY saw great momentum in revenue and brand awareness. P&TY launched a public revenue share campaign with WeFunder in September 2024 as a marketing strategy to attract franchisees and investors. Revenues grew steadily and we had a large list of interested franchisees and investors wanting to partner for P&TY's national brand expansion. Our team was engaged and working on scaling CPG and retail locations.

18.     In June of 2025, a merger was announced in P&TY's accounting firm. P&TY had used them since 2016 and that firm was a vital and reliable partner for our financial data. Shortly before the merger, key accounting staff left the firm and P&TY's financial reports were being sent months later than normal and often contained inaccuracies. In August 2025, P&TY was assigned a new bookkeeper who wasn't experienced with P&TY's financials and had to be retrained before financial reports were shared. P&TY filed a formal complaint with management in November 2025, when P&TY had not yet received accurate or timely financials for the previous four months. The new accounting firm agreed to

complete year-end accounting and tax work. During this time, profitability declined but P&TY lacked the timely financial reports to make changes or shift strategy.

19. Tariffs and global economic conditions have increased our costs of goods sold (paper, coffee, chocolate, shipping, etc.) immensely. Our operations team was busy with holiday cookie business and expansion plans - meeting with franchisees, potential partners and executing contracts in new markets. Once we finally received the 2025 financial reports, in March of 2026, we saw a shocking loss of $430,000.

20. In January 2026, P&TY retained a new accounting firm. It took them approximately 90 days to review P&TY's book and records to provide accurate reporting. For the first time in 15 years of operations, P&TY saw a 19% decrease in year-over-year revenue in January 2026 compared to January 2025.

21. To compound the economic downturn, a viral misinformation campaign was launched against our brand in early February 2026. The company's website and email addresses were hacked. The personal phone numbers and addresses of management and their children were leaked online - with multiple death threats and threats of harm made to their families. Sales were down 31% in February and down 33% in March.

22. Investor and franchise relations cooled with the large revenue decrease and distressed economic conditions. Although preliminary reports show revenues are increasing in April and May. To continue funding operations, P&TY took bridge loans (with personal guarantees), alongside the SBA EIDL loan, the WeFunder debt, and other operating obligations.

23. The current debt load is unsustainable. I began looking for equity partnerships and advice. I was advised by an interested investor on April 22, 2026 that we

speak to a restructuring attorney because P&TY's current debt obligations made it unattractive for potential investors. We spoke to three other interested investors in April, but the debt stack is too high, and P&TY could only generate interest if it restructured its debt.

24.     Knowing that P&TY was in financial distress, I discussed the possibility of a sale with a long term vendor. Rather than see P&TY liquidated in a chapter 7, that vendor expressed interest in purchasing P&TY. Discussions are on-going at this time. I would like to see this brand succeed and jobs retained, even if I'm unable to lead.

### B. Pre-Petition Finances

25.     As of the Petition Date, the Debtor estimates that is has approximately $4,011,213.08 in debt obligations. Approximately $3,063,840.73 is purported to be secured, with the remaining $947,372.35 being unsecured. The Debtor estimates that its personal property and assets have a value of $325,906.54. More information about the Debtors' assets, debts, and property can be found in the Schedules.

26.     P&TY currently generates, on average, between $215,000 and $280,000 a month in revenue. P&TY has six primary sources of revenue:

      (a)     Brick and mortar retail locations: 79% of total revenue;

      (b)     Airstreams: 7% of total revenue;

      (c)     Kiosks: 4.2% of total revenue;

      (d)     Wholesale: 4% of total revenue;

      (e)     Catering/Corporate Events: 3.3% of total revenue; and

      (f)     E-commerce: 2.5% of total revenue

27.     The Debtor's average monthly operating expenses total approximately $240,000. Wages and salaries are P&TY's largest expense at approximately $120,000 per

month. Costs of goods sold include items like food, drinks, merchandise, and packaging are approximately 20% to 40% of revenue depending on the location.

28.     In the time leading up to the bankruptcy filing, P&TY has attempted to reduce its overhead and streamline its operations to reduce its expenses. The Debtor has reevaluated its menu to remove higher cost items that require more expensive ingredients and labor to make. Cuts have also been made to the workforce, and we continue to evaluate areas to improve employee efficiency. In addition, purchases of non-essential items have been halted.

## II.     First Day Motions

29.     Concurrently with the filing of the Chapter 11 Case, the Debtors filed the First Day Motions requesting various forms of relief. Generally, the First Day Motions have been designated to meet the goals of: (a) preserving and protecting the Debtor's chapter 11 estate as a going concern; (b) paying certain pre-petition claims of employees; and (c) obtaining authorization to continue funding the Debtor's operations.

30.     I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to reorganize successfully.

### A. Debtor's First-Day Motion for an Order Authorizing the Use of Cash Collateral and Approving Debtor In Possession Financing ("Cash Collateral and DIP Financing Motion")

31.     By the Cash Collateral and DIP Financing Motion, the Debtor requests authority to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code, pursuant to section 363(c) of the Bankruptcy Code.

32.     Upon reviewing the Debtor's records and searching both the Kentucky and Indiana Secretary of State websites for financing statements issued against the Debtor, bankruptcy counsel located records that indicate there are liens against the Debtor's cash collateral.

33.     The following creditors have filed UCC financing statements with the Kentucky Secretary of State or may assert a lien against the Debtor's cash collateral:

(a)     United States Small Business Administration. On or about June 5, 2020, the Debtor executed a certain loan and security agreement with the United States Small Business Administration (the "SBA") and amended on October 20, 2021, for the principal amount of $2,000,000, with interest accruing at 3.75% per annum.

(b)     Celtic Bank Corporation / Bluevine. On or about November 25, 2020, the Debtor executed that certain financing and security agreement with Celtic Bank Corporation ("Celtic"), which is serviced by Bluevine Capital Inc. This is an open line of credit that the Debtor may draw upon. Upon information and belief, the UCC Financing Statement filed by First Corporate Solutions Inc. on November 25, 2020 (2020-3121801-20.01) secures this loan.

(c)     SouthState Bank, NA. On or about July 10, 2024, the Debtor entered into that certain business loan and security agreement with SouthState Bank, N.A. in the principal amount of $100,000.  A UCC financing statement was unable to be found after conducting a search of the Kentucky Secretary of State's website.

(d)     Celtic Bank / Stripe. On or about September 9, 2025, January 13, 2026,  February 23, 2026, and April 10, 2026, the Debtor entered into separate

commercial loan and security agreements with Celtic Bank, all of which are serviced by Stripe Servicing, Inc. ("Stripe"). Stripe processes all of the Debtor's credit and debit transactions conducted through its point of sale system. Stripe withholds up to 25% per transaction it processes as payment before remitting the balance to the Debtor's account. A UCC financing statement filed by CT Corporation System, as representative, was filed on October 10, 2025 (2025-3382548-60.01).

(e)     ODK Capital, LLC / OnDeck. On or about January 14, 2026, the Debtor executed a certain business loan and security agreement with ODK Capital, LLC, which is serviced by OnDeck. A UCC financing statement filed by Secured Lender Solutions was filed on January 15, 2026 (2026-1629858-59.01).

34.     Because it is first in time, the Debtor believes that the SBA has a first priority lien against substantially all the Debtor's assets.

35.     Stripe serves as the credit and debit card processor for the Debtor's point-of-sale system. The Debtor's point-of-sale software is provided by Dripos, which requires that the Debtor's utilize Stripe as its processor. Each one of the Debtor's retail locations has a loan through Stripe. Combined, the Debtor's obligation to Stripe totals approximately $208,741.

36.     The Debtor does not make payments to Stripe directly, rather, Stripe withholds between 15% to 30% of every transaction it processes and only remits the remaining amount to the Debtor's accounts.

37.     This amount is separate from and in addition to the transaction fee Stripe charges the Debtor to process debit and credit transactions.

38.     Based on the budget attached to the Cash Collateral & DIP Financing Motion, the Debtor requests authorization to use its cash, whether it is cash collateral or not, to pay actual, necessary ordinary course operating expenses, as set forth in the Initial Budget, which includes the costs and expenses associated with maintaining the Debtor's operations and to maximize the Debtor's going concern value.

39.     Absent use of the cash collateral, I believe the Debtor will be unable to meet its ongoing obligations. Approval of the interim use of cash collateral is crucial and necessary under the facts and circumstances of this case. Without such use, the Debtor will face immediate and irreparable harm, and its assets would markedly diminish in value going forward.

40.     I believe that obtaining authorization to use cash collateral is imperative to the Debtor, its estate, its creditors, and its ability to continue operating. The Debtor is therefore asking this Court to authorize the Debtor to use cash collateral pursuant to the initial budget. I believe that the use of cash collateral on the terms set forth in the proposed interim order submitted with the Cash Collateral Motion maximizes the value of the Debtor's assets for the benefit of all stakeholders.

### B. Debtor's First-Day Motion to Pay Employee Wages, Salaries, Withholding Taxes, Benefits, and Business Expenses ("Payroll Motion")

41.     By the Payroll Motion, the Debtor requests entry of an order (a) authorizing, but not directing, the Debtor, per its existing policies to (i) pay all prepetition wages, salaries, and other compensation owed to the Debtor's employees, (ii) pay prepetition employee tax and other withholdings to third-parties, and (iii) maintain and make contributions to prepetition health and other employee benefit programs; (b) authorizing

10

and directing the Debtor's banks to honor and process check and electronic transfer requests related to the foregoing; and (c) granting such other relief as may be appropriate.

42.     As of the Petition Date, the Debtor employs 50 employees: 23 full-time employees and 27 part-time employees (each an "Employee" and collectively, the "Employees"). None of the Employees are subject to a collective bargaining agreement.

43.     P&TY's ability to preserve the value of its business and successfully navigate chapter 11 is dependent on the expertise and continued enthusiasm and service of its Employees. The Employees perform a wide variety of functions critical to the administration of this Chapter 11 Case and the Debtor's restructuring. The Employees' skills, knowledge, and understanding of the Debtor's operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Employees include highly trained personnel who cannot be easily replaced during this critical juncture of this case and without whom the Debtor's reorganization efforts likely will be jeopardized.

44.     In the ordinary course of business, the Debtor maintains various employee benefit plans and policies that provide eligible Employees with medical, dental, and vision plans. The Debtor also provides paid time off ("PTO") to eligible Employees. To offer better value and lower costs to the Employees, the Debtor contributes toward the premium of its health insurance plans. The Debtor utilizes ADP to administer and manage its payroll.

45.     P&TY pays the Employees biweekly on Fridays, with one week in arrears. The expenses related to wages and the Employee Benefit Obligations are as follows:

> (a)     Wages: approximately $60,000 per pay period.
>
> (b)     Health Insurance: approximately $6,900 per month.
>
> (c)     ADP: approximately $200 per pay period.

46.     Employees were last paid on May 22, 2026. The next paycheck is due on June 5, 2026, which will be comprised entirely of pre-petition work. After reviewing the payroll data, None of the Employees will be paid in excess of $17,150 for any earned but unpaid prepetition wages.

47.     Without the authorization to pay wages, health insurance premiums, and honor accrued PTO, I believe most of the Employees would quit. This would cause an immediate cessation of the Debtor's operations.

48.     I believe that the relief requested by the Debtor pursuant to the Employee Wage Motion is reasonable and appropriate under the circumstances and in the best interests of the Debtor's estate.

*- Remainder of page intentionally left blank -*

I, Brooke Vaughn, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: June 2, 2026

/s/ Brooke Vaughn
Brooke Vaughn
Sole Member & President
Please & Thank You, LLC

G:\doc\NCB\PLEASE & THANK YOU LLC\Pleadings\First Days\1. Vaughn Declaration.docx